UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SCOTT BERGEMANN, et al.,
                    Plaintiffs

            v.                              C.A. No. 09-150ML

THE STATE OF RHODE ISLAND, THE
DEPARTMENT OF ENVIRONMENTAL
MANAGEMENT, and GINA M. RAIMONDO
in her official capacity as
Treasurer of the State of Rhode Island,
                    Defendants


**MEMORANDUM AND ORDER**

Mary M. Lisi, Chief United States District Judge.

The plaintiffs, a group of Rhode Island Environmental Police Officers ("EPOs"), bring this action against the State of Rhode Island Department of Environmental Management (the "State"), to recover allegedly unpaid wages and to seek retroactive and future retirement contributions related to "holiday pay." This matter is before the Court on the EPOs' motion for partial summary judgment and the State's motion for summary judgment. For the reasons discussed below, the plaintiffs' motion is DENIED, and the defendants' motion is GRANTED.

I.    **Background Facts and Procedural History**

(A) The Settlement Agreements

The disagreements giving rise to this litigation reach back to 1985, when the Supreme Court determined that state employees are entitled to the protection of the wage and hour provisions of the Fair Labor Standards Act ("FLSA"). <u>Garcia v. San Antonio</u>

<u>Metropolitan Transit Auth.</u>, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2 1016 (1985)(holding that municipal transit authority is not immune from minimum wage and overtime requirements of the FLSA). In 1986, the plaintiffs' union, Local 2881, Council 94 of the American Federation of State County and Municipal Employees ("Council 94") and the State entered into a settlement agreement which provided that EPOs (then titled "Conservation Officers") were entitled to overtime pay if they worked more than 171 hours in a 28 day work cycle. 1986 Agreement ¶ 6. The agreement also addressed pay increases for certain positions and set a prospective requirement for college degrees. <u>Id.</u> ¶¶ 1, 4. In consideration, Council 94 agreed to withdraw two pending arbitration claims for compensatory time. <u>Id.</u> at ¶ 5.

In 1993, Council 94 and the State entered into a second settlement agreement which addressed the computation of holiday hours. Pursuant to this agreement, for any 28 day work cycle within which a holiday fell on an EPO's scheduled workday, the EPO was credited with (1) seven hours worked, and (2) the hours actually worked in excess of seven hours,"solely for the purpose of computing hours worked" for the rest of the work cycle. 1993 Agreement at ¶ 2. If the holiday in a 28 day work cycle fell on an EPO's scheduled day off, the EPO was credited only with the hours actually worked in excess of seven hours on that holiday. <u>Id.</u> In consideration for entering this agreement (applicable only to then unionized RIDEM employees), Council 94 withdrew eight related

grievances. Id. at ¶¶ 1, 2 .

In late 1995, a group of 35 EPOs, including Scott Bergemann ("Bergemann") and 19 other EPOs who are plaintiffs in the instant case, filed suit in this Court under the FLSA "for defendants' alleged failure to satisfy certain overtime and wage provisions contained in a [CBA]." Bergemann v. Rhode Island, 958 F. Supp. 61, 65 (D.R.I. 1997). The plaintiffs also alleged state law claims for breach of contract, unjust enrichment, violation of due process, and breach of prior judgment. Because the Court determined that 11th Amendment immunity barred the EPOs' claims against the State, the case was dismissed, without prejudice, for lack of subject matter jurisdiction. Bergemann v. Rhode Island, 958 F.Supp. at 70.

In December 1997, the State and Council 94 entered into a third settlement agreement (the "1997 Agreement")[1]. In consideration of the Union's withdrawal of six arbitration requests or grievances related to overtime, lunch periods, and vacation, the 1997 Agreement, *inter alia*, changed the job classifications from Conservation Officers to EPOs and raised their respective pay grades significantly. 1997 Agreement ¶¶ 1, 9. With the exception of classification EPO4 (previously held by the Deputy Chief of Enforcement, a non-union position), EPO positions are classified as non-standard positions with a peculiar work schedule. EPOs are assigned a four day on/two day off schedule. Union employees are

---

[1]
The 1997 Agreement was also "assented to in form and in substance" by 34 EPOs as beneficiaries, including 24 of the named plaintiffs in the 1995 litigation.

eligible for compensatory overtime, after having worked one hundred and twenty-eight hours in a twenty-four day period. Such compensatory overtime is calculated at the rate of time and one half. Hours are credited as worked pursuant to the CBA and in accordance with those provisions which apply to standard employees. 1997 Agreement ¶ 5.

Specifically, the 1997 Agreement states:

> The classifications of EPO1, EPO2 and EPO3 shall hold a peculiar work week designation of Non-Standard/Forty hours. The employees covered by this Agreement shall accrue vacation, sick and personal time hours at the rates designated for forty (40) hour per week employees. <u>All leave discharges shall be based on and account for an eight (8) hour scheduled work day, which shall include breaks and lunch periods as employees are considered "engaged to be waiting."</u> All current time balances will be recalculated and adjusted so that employees maintain the same number of whole days on record under the new leave accrual rates for a forty (40) hour work week. The hourly rate of pay shall be calculated based on a Non-Standard/thirty-five (35) hour per week, seven (7) hour per day standard work week. 1997 Agreement ¶ 6. (Emphasis added).

With respect to shift differential,[2] the 1997 Agreement provides that "[s]hift differential shall be calculated on the basis of a thirty-seven and one half (37.5) hour work week and

---

[2]
According to the CBA, employees who are permanently assigned to work (a) 16 or more hours of a 40 hour week, or (b) 14 or more hours of a thirty-five hour week during evening tour of duty (3:00 p.m. to 11:00 p.m) or during night tour of duty (11:00 p.m. to 8:00 a.m.), receive "an additional seventy cents an hour over the rate prescribed for the classification in which their work is performed for all hours of the work week. Any employee who works during the evening or night shift for less than 14 or 16 hours, is compensated at the higher rate only for those hours actually worked." CBA Art. 7.

shall be nine hundred and seventy-five dollars ($975) per year."
1997 Agreement ¶ 11.

Pursuant to Section 2 of the 1997 Agreement, Council 94 agreed
to withdraw the pending arbitration requests and grievances. 1997
Agreement ¶ 2.  In addition, the 1997 Agreement provides that

"[t]he Conservation Officers and the Union shall not
initiate any further legal action against [the State] and
shall accept the terms of this agreement as full and
final settlement of any claims that they have against
[the State] regarding any of the issues discussed in the
agreement." 1997 Agreement ¶ 3.

Finally, the 1997 Agreement contains a severability clause:

If any part or provision of this Agreement, or
application thereof to any person, entity, or
circumstances be adjudged invalid by any court of
competent jurisdiction, the judgement shall be confined
in its operation to the part of or provision of or
application directly involved in the controversy in which
the judgment shall have been rendered and shall not
affect or impair the validity of the remainder of this
Agreement or the application thereof to other persons,
entities, or circumstances.  In the event that a
provision of this agreement is determined to be invalid,
the parties agree to renegotiate such provision.  1997
Agreement ¶ 14.[3]

(B) Bergemann's Dispute Over Meal Periods

According to EPO Bergemann, in January 1999, he requested that
Council 94 file a grievance regarding non-payment of meal periods.
Bergemann Affidavit, Pltfs.' Ex. 13 ¶ 5, Docket No. 37-12.

---

[3]

The 1997 Agreement contains no provision with respect to
interpretation, application, or violation thereof, nor does it
refer to the CBA or include any requirement for arbitration or
grievance, should a violation be asserted.

Bergemann was advised by Ray Larson, president of Council 94, that he could not file another grievance regarding this issue because the matter had already been resolved in the 1997 Settlement Agreement. Id. at ¶ 6.

In 2001, Bergemann filed a further grievance, requesting that the EPOs be paid according to a different work week. The issue was sent for arbitration; however, after the State Labor Relation Administrator forwarded a draft complaint to Council 94, alleging that the grievance was in violation of the 1997 Agreement, Council 94 withdrew the case from arbitration. Defs.' Ex. P.

On February 18, 2004, Bergemann requested a judicial procedure hearing by a National AFSCME Judicial Panel.[4] Defs.' Ex. O. Essentially, Bergemann alleged that Council 94 failed to represent its membership and that Council 94 staff was incompetent and "acting in collusion with management." Id. at page 4 of 5. Relative to the instant case, Bergemann alleged, *inter alia*, that the State had breached the 1997 Agreement and that grievances had been filed. Id. at page 2-3 of 5. Bergemann explained that the EPOs believed that the 1997 Agreement would compensate them for 1952 hours of work annually (244 eight hour days on a four on/two off shift), but that they received only compensation for 1820 hours annually (244 seven and one half hour days). Bergemann arrived at

---

[4]
　　Although it is not entirely clear from Bergemann's letter, his claims were apparently directed against former Council 94 executive director John Furia and interim director Dennis Grilli. Claims against Local 94's legal counsel Gerard E. O'Neill ("O'Neill") were dismissed because O'Neill was not a member of AFSCME.

this conclusion by (1) multiplying the EPOs' hourly rates by 1820 hours and (2) by observing that court officers and EPOs with the same pay grade and annual wage are assigned the same hourly rate, but that court officers work 1820 hours per year, whereas EPOs work 1952 hours. Id. at page 3 of 5. According to Bergemann, he filed a grievance and "followed [ ] through all the steps;" the grievance was lost at levels 2 and 3; and a slated arbitration was dropped. Bergemann also asserted that a grievance filed in 1999 was slated for arbitration in October 2002 and then postponed to February 2003. Id. at page 4 of 5.

On its part, Council 94's counsel informed the Judicial Panel on March 22, 2004 that Bergemann had filed a grievance in 2001, seeking payment for EPOs according to a different work week. Defs.' Ex. P. The State had responded by sending a draft complaint to Council 94, in which it alleged that the grievance related to lunch periods, which had already been resolved, and that it was in violation of the 1997 Agreement. In addition, the State sought a declaration that the grievance was not arbitrable and that the 1997 Agreement was now void. Defs.' Ex. I. According to O'Neill, he recommended that Bergemann's grievance be withdrawn because it was filed 3 years too late and involved an issue already settled in the 1997 Agreement. Id. at page 1 of 3. O'Neill also advised Bergemann that "if the matter was not withdrawn from arbitration the State could seek to void the [1997 Agreement] and eliminate the substantial pay grade increases of all the [EPOs]." Id. at page 3 of 3.

-7-

On August 25, 2004, after conducting a one-day trial, the AFSCME Judicial Panel issued a written decision, finding that Council 94's decision not to proceed to arbitration regarding compensatory time under the 1997 Agreement was not a violation of the CBA. Defs.' Ex. Q at page 7 of 8. The Judicial Panel also rejected Bergemann's claims of collusion between Council 94 staff and management. Id. The decision noted that Bergemann agreed that "as part of the settlement [] all grievances relating to lunch periods would be withdrawn with prejudice." Id. at page 5 of 8.

(B) Lees' Dispute Over Retirement Contributions

By letter dated August 4, 2004, EPO Lieutenant Dean Lees ("Lees"), requested clarification and confirmation from the Employees' Retirement System of Rhode Island ("ERSRI"), that EPO holiday pay was subject to state retirement contributions. In response, Executive Director of the ERSRI, Frank J. Karpinski ("Karpinski"), by letter dated October 29, 2004, referred Lees to Section 36-8(1)(7) of the Rhode Island General Laws, which states that "compensation" does not include "payments made for overtime or reasons other than performance of duties or activities." Pltfs.' Ex. 9.

Karpinski wrote: "[I]t has been ERSRI's long-standing position that 'regular' holiday and longevity pay are to be treated as 'compensation' within the meaning of the statute." Karpinski also referred Lees to ERSRI Memorandum No. 36, for clarification of whether or not "holiday pay" constitutes compensation for retirement contribution purposes. Defs.' Ex. B to Karpinski

Affidavit. Memorandum 36 states that "a. Retirement contributions should be deducted from that amount which equals the member's annual compensation, regardless of the method by which payments are distributed e.g. weekly, bi-weekly, monthly or other;" and "b. Pension contributions should not be deducted from any amount that exceeds the member's regular annual compensation. This 'extra' compensation is considered overtime pay from which no retirement contributions are deducted." Memorandum 36 at 1.

Memorandum 36 also offers the following examples: If the employee does not work on a holiday but receives his or her regular annual compensation, the compensation is considered 'regular pay' and retirement contribution should be deducted . . . If the employee works the holiday and receives compensation in excess of his/her regular annual compensation, no retirement contributions should be deducted from that amount which is in excess of the member's 'regular pay.'" Id.

By letter dated December 27, 2007, Human Resource Administrator for RIDEM, Paul E. Pysz ("Pysz"), informed Lees that "any official holidays that fall on an employee's scheduled day off is [sic] treated as an adjustment, and is [sic] not subject to retirement contributions." Defs.' Ex. M page 4 of 5. Pysz's letter also states that any changes would need to be addressed by collective bargaining representatives and the Department of Administration and that, "[i]n light of legal ramifications and associated increased contribution costs to the employer this matter cannot be advanced any further administratively." Id.

-9-

On October 2, 2008, Council 94 filed a class action grievance seeking the addition of holiday pay toward retirement accrual. Defs.' Ex. M pages 2-3 of 5. The grievance was withdrawn by Council 94 on March 13, 2009. Id. at page 5 of 5.

(C) The EPOs' Complaint

On December 23, 2008, while Council 94's grievance was still pending, the EPOs, on their own, initiated a suit against the State of Rhode Island, RIDEM, and the State Treasurer in Rhode Island Superior Court, asserting, *inter alia*, violation of the FLSA, violation of R.I. Gen. Laws § 36-8-1 et seq.,[5] as well as unjust enrichment. The State removed the case to this Court pursuant to 28 U.S.C. § 1441 and the plaintiffs filed a motion for remand, arguing that the Eleventh Amendment protects the State from litigation in federal court without the State's consent. The State then sought dismissal of the EPOs' FLSA claim on the ground that this Court lacks subject matter jurisdiction over the claim. After a hearing on the parties' motions, the Court conducted a conference with the parties and afforded them an opportunity for additional briefing. Subsequently, the Court denied the EPOs' motion to remand the case and it granted the State's motion to dismiss the FLSA claim. Bergemann v. Rhode Island, 676 F. Supp. 2d 1 (D.R.I. 2009).

Following this determination, the Court conducted a further

---

[5]
This statute addresses the administration of retirement systems for Rhode Island State employees.

conference with the parties, permitted the EPOs to amend their complaint and set a discovery schedule. In their second amended complaint, the EPOs reassert the FLSA claim[6] and allege that the defendants require them to work through unpaid meal periods. Second Amended Complaint, Count I. The EPOs also claim in Count II that the defendants have refused to include the plaintiffs' holiday pay in their retirement contribution totals, as required by R.I. Gen. Laws § 36-8-1(7); in Count III, the plaintiffs claim that the defendants have been unjustly enriched by failing to pay the plaintiffs for work performed in their official duties; and Count IV asserts that the defendants have breached the Master Agreement by mandating that Non-Standard Employees work during the lunch period.[7] In their answer, the defendants point out that Count I was previously dismissed by this Court, and they assert, inter alia, sovereign immunity and res judicata and/or collateral estoppel under Bergemann v. State of Rhode Island, 958 F. Supp. 61 (D.R.I. 1997).

(D) The Parties' Motions For Summary Judgment

After the close of discovery, the plaintiffs filed a motion

---

[6]

The Court assumes that, by reasserting the FLSA claim which had been previously dismissed, the plaintiffs intended to preserve the claim for a possible appeal.

[7]

Count V, which is styled as a separate claim, seeks declaratory relief for the allegations asserted in the Complaint. According to Bergemann's answer to interrogatories, he believes that he is owed approximately $44,573 for hours of work he performed, but was not paid for, between 1998 and March 2010.

for partial summary judgment in which they argue that (1) the defendants have breached and continue to breach the Master Agreement "by failing to compensate the plaintiffs for all of their hours of service," Pltfs.' Mem. (Docket No. 29) at 4; (2) the defendants continue to be unjustly enriched for services provided by the plaintiffs "above and beyond the Thirty Five (35) contractual hours the 'salary' compensates them for," id. at 10; and (3) defendants have failed to provide the plaintiffs with all retirement benefits to which they are entitled under R.I. Gen. Laws § 36-8-1 et seq., id. at 12.

The defendants filed a motion for summary judgment on the grounds that (1) the plaintiffs' complaint is barred by the applicable statute of limitations, Defs.' Mem. 7; (2) the plaintiffs have failed to allege a breach of the duty of fair representation by their union, id. at 9; (3) the plaintiffs are precluded from bringing a civil action in the courts because they have elected the CBA remedies of grievance and arbitration, id. at 13; (4) the plaintiffs have failed to exhaust their CBA grievance and arbitration remedies, id. at 16; (5) the State has not breached its contract with the plaintiffs with respect to payment of meal periods, id. at 18; (6) the State has not violated the Rhode Island statute on retirement contributions, id. at 19; and (7) as to unjust enrichment, the State takes the position that the EPOs are being paid for their meal periods and that, therefore, no unpaid benefit inures to the State. Id. at 24.

Each party filed an objection to the other party's motion, and

the plaintiffs filed a reply to the defendants' objection.[8]  The
Court held a hearing on the parties' motions, after which it took
the motions under advisement.

## II.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, a motion for
summary judgment should be granted only "if the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c)(2).  A "material fact" is one "that might affect the
outcome of the suit under the governing law."  <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d
202 (1986).  An issue is "genuine" when "the evidence is such that
a reasonable jury could return a verdict for the nonmoving party."
<u>Id.</u>

The burden to show the absence of a genuine issue of material
fact rests on the party moving for summary judgment.  <u>Celotex Corp.
v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265
(1986).  Once the moving party has met its burden, the nonmoving

---

[8]

The Court notes that both parties filed the requisite
Statement of Undisputed Facts and that neither party filed a
Statement of Disputed Facts.  Pursuant to Local Rule LR Cv
56(a)(3), "any fact alleged in the movant's Statement of Undisputed
Facts shall be deemed admitted unless expressly denied or otherwise
controverted by a party objecting to the motion" by a Statement of
Disputed Facts as specified in the rule.  Local Rule LR Cv
56(a)(3).  <u>See</u> <u>Puerto Rico American Ins. Co. v. Rivera Vazquez</u>, 603
F.3d 125, 131 (1st Cir. 2010)(Anti-ferret rule "is aimed at enabling
a district court to adjudicate a summary judgment motion without
endless rummaging through a plethoric record.").

party must demonstrate that, "with respect to each issue on which she would bear the burden of proof at trial, . . . a trier of fact could reasonably resolve that issue in her favor." <u>Borges ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010).

In considering a motion for summary judgment, the Court must take the facts "in the light most favorable to the nonmoving party, drawing all reasonable inferences therefrom to that party's behoof." <u>Puerto Rico American Ins. Co. v. Rivera-Vazquez</u>, 603 F.3d at 130. However, the Court may ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

"The presence of cross-motions 'neither dilutes nor distorts'" the Rule 56 standard of review. <u>Scottsdale Ins. Co. v. Torres</u>, 561 F.3d 74, 77 (1st Cir. 2009)(internal citations omitted). Instead, "cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Id.</u> (citing <u>Littlefield v. Acadia Ins. Co.</u>, 392 F.3d 1, 6 (1st Cir. 2004)).

Although the State has offered a number of arguments on why the EPOs' claims are barred on procedural grounds, counsel for the State stated at oral argument that, in light of the prolonged litigation in this case, the State seeks a judgment on the merits of the issues at this time. The Court, therefore, proceeds directly to the Parties' claims on the merits.

### III. Discussion

(A) The "Unpaid" Meal Periods

Even if the EPOs were to overcome the procedural barriers to the instant litigation, it appears that summary judgment on their claims is not warranted.  According to the EPOs, "[e]ssentially, the wage dispute initially centers around whether the plaintiffs are hourly or salaried employees in accordance with their employment agreement."  Pltfs.' Mem. at 2. In their objection to the State's motion for summary judgment, however, the EPOs now assert that "there minimally exists a material factual issue based upon all of the evidence as to whether the EPO's [sic] should be considered salaried or hourly employees."  Pltfs.' Obj. at 9.

Neither argument carries the day. Based on the payment schedules attached to the CBA, the EPOs are paid an annual salary, which includes ten paid holidays (eleven in an election year), in full payment of working eight hour days on a four days on/two days off schedule.  The EPOs also receive additional compensation related to longevity, shift work, their educational requirement, and, in recognition of the impact of their peculiar schedule on holidays, they receive straight pay for holidays off and pay at an overtime rate for work performed on holidays.  The additional remunerations are the result of negotiated terms in the 1997 Agreement which have been incorporated into the CBA, and to which the EPOs assented as beneficiaries.

A thorough review of the parties' pleadings and submitted documentation reveals that, with respect to the EPOs' claim regarding unpaid lunch hours, their allegations are entirely unsupported.  The EPOs, who work a four-day on, two-day off

schedule, calculate that they are scheduled to work approximately 1,952 per year but that they are compensated only for 1,820 hours.[9] Because this difference amounts to approximately 2.5 hours per work week, the EPOs assert that "it appears that the [State's] failure to compensate the EPO's [sic] for working through their half-hour meal period is the cause of the discrepancy between hours worked and hours compensated." Pltfs.' Mem. at 5 n. 4.

In other words, the EPOs seem to draw the connection between (1) the average two and a half hours per week, for which they are allegedly uncompensated, and (2) the five half hour lunch periods in a non-standard work week, primarily because the two numbers approximately correspond to one another. There is nothing in the record to support their assertion that the EPOs' lunch periods are actually unpaid after the 1997 Agreement was enacted. Instead, the negotiated annual salary compensates them for working full eight hour days on a four days on/two days off schedule. The additional hours worked over the course of a year (when compared, *e.g.*, to the work schedule of court officers) is the function of their peculiar work schedule which was already in place when the 1997 Agreement was negotiated.

The dispute over payment for lunch periods, which had been repeatedly raised by the EPOs for years, was specifically addressed in the 1997 Agreement after the State recognized that EPOs were

---

[9]

    The EPOs' calculation of their scheduled working hours appears to be roughly based on the number of four-day on/two-day off periods in a 365 day year (365 days/6 x 4 x 8 hours = 1946 hours).

expected to answer telephones or remain on call during the entire eight hour workday. Pursuant to the 1997 Agreement, EPOs accrue vacation, sick and personal time hours at the same rate as employees who work a 40 hour week. 1997 Agreement ¶ 6. Likewise, leave discharges are based on an eight hour work day "which shall include breaks and lunch periods as employees are considered 'engaged to be waiting.'" Id. With respect to the hourly rate of pay, however, the calculations are based on a thirty-five hour work week. These terms of the 1997 Agreement, which explicitly recognizes the necessity for EPOs to remain available during their entire eight hour work day and also accounts for the EPOs' peculiar work schedule, were negotiated by the State and Council 94. Moreover, the EPOs, including the majority of the plaintiffs in this case, confirmed their assent "in form and substance" by signing the 1997 Agreement.

In suggesting that the State is unjustly enriched, the EPOs assert that they work an additional 132 hours each year for which they not compensated. The EPOs arrive at this conclusion by multiplying the hourly rate listed on their paycheck by the thirty-five hours also listed on their pay check and then pointing out that those hours do not reflect their actual work schedule. Pltfs.' Reply at 2. This calculation is conceptually mistaken. As negotiated by the State and Council 94, the hourly rate is derived by using a thirty five hour week as a denominator of the annual salary, which results in a higher hourly rate than would be calculated using a forty hour week. As explained by Melanie

-17-

Marcaccio, Deputy Personnel Administrator of the Department of Administration for the State of Rhode Island, the hourly rate, which is noted on all state employee paychecks, "allows employees to verify that 'adjustments' are made at the correct rate of pay. Adjustments include overtime calculations, holiday pay (whether worked or not), Garcia pay, worker's compensation, payment for reduced hours, leave without pay and payment of accruals upon separation." Marcaccio Affidavit ¶ 13. Using a thirty five hour week to calculate these adjustments actually results in a significant benefit to the EPOs. Id.

It is undisputed that the four day on/two day off schedule results in varying work hours per week. Regardless of whether an EPO works more or less than 35 hours in a particular week, he will receive one twenty-sixth of his annual pay per bi-weekly paycheck (subject to applicable adjustments). While the peculiar work schedule results in an average of thirty seven and one half work hours per week, the additional two and a half hours per week are not, as the EPOs suggest, uncompensated.

The EPOs receive an annual salary, payable bi-weekly at a rate of one twenty-sixth (1/26) of the annual rate of pay or salary, which compensates them for all the work they perform according to their peculiar work schedule. Defs.' SUF ¶ 31. [10] Under the terms

---

[10]

As counsel for the State explained at the hearing, the calculation of pay on a 35 hour week results in a more favorable hourly rate to the EPOs. However, regardless of whether the hourly rate is derived by dividing the annual pay by 40 or 35, the annual

of the 1997 Agreement negotiated by the State and Council 94, the EPOs accrue vacation, sick and personal time hours at the rates designated for forty (40) hour per week employees; however, the hourly rate of pay is calculated "based on a Non-Standard/thirty-five (35) hour per week, seven(7) hour per day standard work week." Leave discharges for EPOs are based on an eight hour scheduled work day "which shall include breaks and lunch periods as employees are considered 'engaged to be waiting.'" 1997 Agreement ¶ 6.

Nothing the EPOs have submitted in support of their argument provides a basis to establish that the State has breached the 1997 Agreement or the CBA into which it was incorporated.  Rather, the record and undisputed facts in this matter support the State's contention that the EPOs have been paid their total annual salary for the work they perform according to a peculiar work schedule. While the implementation of the 1997 Agreement, to which the EPOs confirmed their assent, may not have met the EPOs' expectations, their disagreement is not sufficient to withstand the State's motion for summary judgment on Counts III and IV of the Complaint.

(B)  Retirement Contributions For Holiday Pay

The EPOs allege that the compensation they receive for "holiday pay" must be included in their retirement contribution totals.  Second Amended Complaint ¶ 70.  The State takes the position that payment for scheduled holidays, which is in addition to an EPO's annual salary, is in the nature of overtime and,

---

rate, which has been negotiated as full compensation for the work performed by the EPOs, remains unchanged thereby.

therefore, excluded from retirement contributions. State Mem. 19-20.

The EPOs are paid according to Schedule 300 attached to the CBA which sets forth "Classified Annual Salaries." Pltfs.' 1. In addition, they receive a shift differential as specified in paragraph 11 of the 1997 Agreement. 1997 Agreement ¶ 11. Depending on their length of service, the EPOs also receive longevity pay and they receive educational incentives for holding or obtaining a bachelor's degree, which is now mandatory for their occupation. Together, these remunerations make up an EPO's total annual salary, of which one twenty-sixth is paid biweekly, in accordance with R. I. Gen. Laws § 36-6-10.[11] Included within the annual salary are ten paid holidays, eleven in an election year. CBA Art. 9.

As State employees, the EPOs are required to contribute an amount equal to 8.75% of their compensation as their "share of the cost of annuities, benefits and allowances," and the State contributes more than 20% of an employee's compensation as its share. R.I. Gen. Laws §§ 36-10-1(a), 36-10-2(a), State SOF 27, 28. It is undisputed that the entire annual salary is subject to retirement contributions.

--------

[11]

R.I. Gen. Laws § 36-6-10 provides:

All salaries of state employees and officials shall be payable biweekly and the biweekly rate shall be one twenty-sixth (1/26) of the annual rate. The biweekly rate shall be considered to be complete payment of the annual rate.

For the purpose of retirement contributions, compensation is defined as "salary or wages earned and paid for the performance of duties for covered employment." R.I. Gen. Laws § 36-8-1(7). Such "compensation" includes regular longevity or incentive plans, but specifically excludes "payments made for overtime or reasons other than performance of duties or activities . . . including "[a]dditional payments for performing temporary or extra duties beyond the normal or regular work day or work year." R.I. Gen. Laws § 36-8-1(7)(v).

With respect to compensatory time for holiday pay, the 1997 Agreement refers to Article 9.3 of the CBA, which provides, in pertinent part:

> Whenever a[] ... non-standard employee is required to work on a holiday which falls on their regularly scheduled work day, they shall be credited with the number of hours in their official work schedule for that day, plus the number of hours actually worked. The Hours actually worked shall be compensated at the rate of one and one-half times." CBA Art. 9.3, 1997 Agreement ¶ 6.

In addition, Article 9.4 of the CBA, although not referenced in the 1997 Agreement, provides that

> [i]f a holiday falls on one of an employee's regularly scheduled days off, they shall be credited with the number of hours for one day in their official work schedule. The hours so credited for this day shall not be used in the computation of overtime. CBA Art. 9.4.

As negotiated by the State and Council 94, although the EPOs' annual salary includes ten or eleven paid holidays, the EPOs receive additional compensation for any holiday on which they are not scheduled to work. For any holiday on which they actually do

perform work, they are paid at overtime rates in addition to such compensation. Because EPOs work on a peculiar four days on, two days off schedule, some of the scheduled holidays will fall on a day when an EPO is scheduled to be off duty, whereas other holidays will fall on a day when an EPO is scheduled to work. In either case, the EPO is credited with the number of hours in the official work schedule. On the occasion the EPO has to work on a scheduled holiday, the EPO receives additional compensation for the number of hours actually worked at the rate of time and a half.

As such, those additional payments are not part of the biweekly compensation "considered to be complete payment of the annual rate." R.I. Gen. Laws § 36-6-10. Rather, the additional credit or payments are received "for performing temporary or extra duties beyond the normal or regular work day or work year." Retirement contributions for holiday pay which the EPOs receive in addition to their regular compensation are precluded by Section 36-8-1(7)(v).

The EPOs suggest that, because their "contractual compensation for holidays is paid as part of the EPOs' normal and regular work year," the holiday pay should be included in the retirement contribution calculation. Pltfs.' Reply at 3-4. While it is correct that, due to their peculiar work schedule, scheduled holidays will fall on either a "day on" or "day off" for each EPO, this does not render the holiday pay part of the annual compensation. Rather, it constitutes additional pay to remunerate the EPOs for the impact of holidays on their work schedule.

Based on a thorough review of the record and the parties' submissions, it is this Court's conclusion that the EPOs' retirement contributions have been properly calculated on their annual compensation, which includes ten (or eleven) paid scheduled holidays. In essence, the EPOs are the recipients of a negotiated benefit with respect to holidays, presumably in recognition of a peculiar work schedule that may frequently require them to work on holidays. Neither the CBA nor the 1997 Agreement provides that such additional benefits are to be further enhanced by including them in retirement contribution calculations. In fact, the Rhode Island Statutes specifically prohibit such inclusion. See supra, R.I. Gen. Laws § 36-8-1(7)(v). Accordingly, the State's Motion for summary judgment on Count II of the Complaint is granted.

(C) Election of Remedies and Failure to Exhaust Administrative Remedies.

Upon the urging of the State, this Court has addressed and decided the plaintiffs' substantive claims on their merits. There is one procedural matter, however, that the State has raised and that was fully briefed by both sides which the Court feels compelled to address here. The Court does have some concerns regarding the jurisdictional basis of the EPOs' claims. See supra. The State asserts that, by previously electing to grieve the issues regarding meal periods and retirement contributions, the EPOs are precluded from raising the same claims in this Court. Defs.'Mem. at 14. Because those grievances were either withdrawn or settled by the 1997 Settlement Agreement, the State also submits that the

EPOs have not exhausted the applicable grievance arbitration procedures.

The doctrine of election of remedies is "designed to mitigate unfairness to both parties by preventing double redress for a single wrong." <u>RIDEM v SLRB</u>, 799 A.2d 274, 277 (R.I. 2002)("'when one party to a CBA attempts to take advantage of the grievance procedure and loses, the election of remedies doctrine prohibits that party from pursuing the same dispute in the courts of this state.'")(quoting <u>Cipolla v. Rhode Island Coll. Bd. of Governors for Higher Educ.</u>, 742 A.2d 277, 281 (R.I. 1999)).

Pursuant to Article 25 of the CBA, "nothing contained herein deprives an individual employee of the right to process their grievance without Union representation." CBA at 58. Pursuant to Article 25.3 therein, "[a] Civil Service Employee may process their grievance through either the grievance procedure or before the Personnel Appeal Board. However, the initiation of a matter before the Personnel Appeal Board shall be deemed a waiver of the employee's right to utilize or continue to utilize the grievance procedure provided herein with respect to that matter." <u>Id.</u> at 59. There is nothing to indicate whether Bergemann and/or the EPOs took any of their grievances before the Personnel Appeal Board.

A review of the record indicates that, on September 29, 2008, the EPOs submitted a request for a class action grievance in a quest to include holiday pay into retirement contributions. Defs.' Ex. M page 3 of 5. On October 2, 2008, Council 94 filed a grievance regarding the matter with the State. Defs.' Ex. M. page

2 of 5.  On December 23, 2008, the EPOs file their complaint in Rhode Island state court, seeking, *inter alia*, a remedy for some of the same issues.  Complaint at ¶¶ 62-68.  According to a note by Belinda A. McLaughlin, the Hearing Officer, Council 94 withdrew the grievance on March 13, 2009.  Defs.' Ex. M at 5 of 5.  From that, it would appear that the EPOs filed their complaint while the grievance addressing at least one of their claims was still pending.

Generally, employees must exhaust grievance procedures provided in the CBA before they can bring an action against an employer for breach of the CBA.  See Vaca v. Sipes, 386 U.S. 171, 184-85, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).  However, exhaustion is not required where the plaintiff can demonstrate that the union breached its duty of fair representation or where further resort to the grievance procedures would be futile.  Ramirez-Lebron v. Int'l Shipping Agency, 593 F.3d 124, 132 (1st Cir. 2010).

According to the EPOs, Council 94 has refused to file any further grievances regarding retirement contributions and holiday pay.[12]  However, the fact remains that Council 94 did file a grievance in October 2008 in connection with the retirement contributions and that the EPOs commenced a civil suit against the

---

[12]
Counsel for the EPOs stated at oral argument that, pursuant to Section 36-11-12 of the Rhode Island General Laws, retirement contribution disputes are not subject to the grievance process. R.I. Gen. Laws § 36-11-12 provides that "[a]ny and all matters relating to the employees' retirement system of the state of Rhode Island are excluded as negotiable items in the collective bargaining process."

State while such grievance was still pending.  Moreover, it has not been established whether the EPOs sought to bring a grievance without Union representation, _i.e._ before the Personnel Appeal Board, nor have the EPOs alleged, before now, that Council 94 has breached its duty of fair representation.[13]

In sum, the EPOs appear to have elected their remedy by initiating a grievance, at least with respect to the retirement contribution issue, before filing suit in this Court.  In addition, they have not provided conclusive evidence that they have exhausted the grievance procedures afforded them under the CBA.  Under those circumstances, even if their claims were to be deemed meritorious, the EPOs appear to be precluded from bringing a claim against the State in this Court both under the election of remedies doctrine and the requirement to exhaust their administrative remedies.

### Conclusion

For the reasons set forth above, the plaintiffs' motion for partial summary judgment is DENIED; and the defendants' motion for summary judgment is GRANTED with respect to Counts II, III, and IV of the Complaint.  Because this Court previously disposed of the FLSA claim in Count I of the EPOs' complaint on its merits, _see_

---

[13]

The EPOs state that "[s]ignificantly, Defendants' Motion for Summary Judgment represents the first occasion Defendants have raised the EPO's [sic] purported failure to allege the Union's breach of its duty of fair representation.  Defendants failed to cite it as an affirmative defense or as an issue in their Answer to EPO's [sic] First Amended Complaint or any other pleadings." Pltfs.' Obj. at 6-7.  The Court notes, however, that the burden of alleging and establishing such a breach is on the EPOs, not the State.

<u>Bergemann v. Rhode Island</u>, 676 F. Supp. 2d 1 (D.R.I. 2009), entry of judgment for the State is ordered herewith.


SO ORDERED.

<u>/s/ Mary M. Lisi</u>

Mary M. Lisi
Chief United States District Judge

March 18, 2011